No. 21-16540

# United States Court of Appeals for the Ninth Circuit

ANTHONY CHERNETSKY,

*Plaintiff-Appellant,*

v.

STATE OF NEVADA, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Nevada, No. 3:06-cv-00252-RCJ,
Hon. Robert C. Jones

## BRIEF OF *AMICI CURIAE* ISLAM AND RELIGIOUS FREEDOM ACTION TEAM, JEWISH COALITION FOR RELIGIOUS LIBERTY, AND SIKH COALITION IN SUPPORT OF PLAINTIFF-APPELLANT

Nicholas R. Reaves
YALE FREE EXERCISE CLINIC
1919 Pennsylvania Ave.
NW, Suite 400
Washington, DC 20006
(202) 955-0095
nicholas.reaves@yale.edu

Dino L. LaVerghetta
Christopher S. Ross
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
dlaverghetta@sidley.com
christopher.ross@sidley.com

Connor R. Brewer
SIDLEY AUSTIN LLP
2021 McKinney Ave., Ste. 2000
Dallas, TX 75201
cbrewer@sidley.com

*Counsel for Amici Curiae\**

\*Counsel acknowledge Yale Law School Free Exercise Clinic students Avi
Feinsod, Blake Hirst, and Tiffany Li for their contributions to this brief.

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST</u>

Under Federal Rule of Appellate Procedure 26.1, the Islam and Religious Freedom Action Team, Jewish Coalition for Religious Liberty, and Sikh Coalition hereby certify that they have no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST.................i

TABLE OF AUTHORITIES....................................................iv

AMICI CURIAE'S IDENTITY, INTEREST, AND AUTHORITY TO FILE.......................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 3

ARGUMENT ...................................................................... 5

I.   CLEAR GUIDANCE FROM THIS COURT WILL FULFILL RLUIPA'S PROMISE TO PROTECT RELIGIOUS MINORITIES. ............................................................. 5

   A.   RLUIPA is uniquely important for religious minorities. ....... 5

   B.   This case highlights the need for this Court to clearly reaffirm the exacting burden that RLUIPA imposes on the state................................................................. 8

II.  THE DISTRICT COURT ERRED BY FAILING TO APPLY THE STRICT SCRUTINY FRAMEWORK MANDATED BY RLUIPA. ...................................................................... 11

   A.   RLUIPA Was Passed Specifically to Replace the Deferential *Turner* Standard with Strict Scrutiny. ............ 11

   B.   The Courts Have Been Clear that RLUIPA's Strict Scrutiny Framework Replaces *Turner* and Mandates an Exacting Analysis................................................ 15

   C.   The District Court Failed to Conduct the Analysis Required by RLUIPA. .......................................... 18

III. UNDER THE CORRECT LEGAL STANDARD, NEVADA FAILS TO SHOW THAT ITS PROHIBITION ON ANOINTING OILS FROM OUTSIDE VENDORS SATISFIES STRICT SCRUTINY. ............................................... 20

   A.   Nevada's asserted compelling interests are inadequate under RLUIPA. ................................................. 21

B.      Nevada fails to show that denying access to oils from outside vendors is the least restrictive means to achieve any compelling interests. ...................................................... 23

CONCLUSION ........................................................................ 30

CERTIFICATE OF COMPLIANCE ...................................... 31

CERTIFICATE OF SERVICE ................................................ 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al Saud v. Days*,
   36 F.4th 949 (9th Cir. 2022), *amending and superseding
   on rehearing*, 50 F.4th 705 (9th Cir. 2022)...........................................8

*Alphonsis v. Garnica*,
   No. 21-56141, 2022 WL 7842130 (9th Cir. Oct. 14, 2022) ..................8

*Bautista v. Roskamm*,
   No. 21-15476, 2022 WL 2662876 (9th Cir. July 11, 2022)..................8

*Beraha v. Dzurenda*,
   No. 20-16516, 2022 WL 17818544 (9th Cir. Dec. 20, 2022) ...............8

*Blake v. Dzurenda*,
   No. 3:19-cv-00321-ART-CSD, 2022 WL 17081166 (D. Nev.
   Nov. 18, 2022) .......................................................................................8

*Blake v. Dzurenda*, No. 3:19-cv-00321-ART-CSD, 2022 WL
   1597801 (D. Nev. May 3, 2022), *report and recommenda-
   tion adopted in part and rejected in part*, 2022 WL
   17081166 (D. Nev. Nov. 18, 2022) .....................................................10

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014)..............................................................................26

*Cavin v. Mich. Dep't of Corr.*,
   927 F.3d 455 (6th Cir. 2019)...............................................................10

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005)..................................................................5, 14, 15

*Din v. Dep't of Corr.*,
   No. S-18095, 2023 WL 2151070 (Alaska Feb. 22, 2023) ...................25

*Elias v. Kinross,*
 No. 2:17-CV-2106-WBS-DBP, 2022 WL 4130711 (E.D.
 Cal. Sept. 12, 2022) ................................................................ 8

*Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter,*
 456 F.3d 978 (9th Cir 2006) .................................................. 5

*Haight v. Thompson,*
 763 F.3d 554 (6th Cir. 2014) ................................................ 9

*Holt v. Hobbs,*
 574 U.S. 352 (2015) ................................... 11, 16, 17, 18, 21, 24, 26, 28

*Johnson v. Baker,*
 23 F.4th 1209 (9th Cir. 2022) ..................... 8, 10, 11, 19, 21, 22, 23, 25

*Johnson v. Lopez,*
 No. 2:15-cv-00884-JAD-NJK, 2018 WL 1567351 (D. Nev.
 Mar. 30, 2018) ..................................................................... 10

*Jones v. Slade,*
 23 F.4th 1124 (9th Cir. 2022) .............................................. 8

*Mast v. Fillmore Cnty.,*
 141 S. Ct. 2430 (2021) .......................................................... 29

*Murphy v. Mo. Dep't of Corr.,*
 372 F.3d 979 (8th Cir. 2004) ............................................... 16

*O'Lone v. Est. of Shabazz,*
 482 U.S. 342 (1987) .............................................................. 13

*Odneal v. Pierce,*
 324 F. App'x 297 (5th Cir. 2009) ........................................ 16

*Riggins v. Clarke*
 403 F. App'x 292 (9th Cir. 2010) ........................................ 19

*Riley v. Kernan,*
 815 F. App'x 163 (9th Cir. 2020) ........................................ 8

*Shakur v. Schriro,*
  514 F.3d 878 (9th Cir. 2008) ............................................. 15, 16, 21, 26

*Sherman v. Wickham*,
  No. 3:21-CV-00168-ART-CSD, 2022 WL 6260301 (D. Nev.
  Aug. 3, 2022) ................................................................... 22

*Turner v. Safley,*
  482 U.S. 78 (1987) ............................................................ 12

*Uhuru v. Bonnifield,*
  No. 2:19-CV-10449-JVS-KES, 2022 WL 3580769 (C.D.
  Cal. July 19, 2022) ........................................................... 8

*Warsoldier v. Woodford,*
  418 F.3d 989 (9th Cir. 2005) ............................................. 17, 19, 23, 28

*Washington v. Klem,*
  497 F.3d 272 (3d Cir. 2007) ............................................... 23

*Watkinson v. Alaska Dep't of Corr.*,
  No. 21-35084, 2022 WL 1301895 (9th Cir. 2022), *cert. de-
  nied*, 143 S. Ct. 732 (2023) ................................................ 8

## Statutes

42 U.S.C. § 2000cc-1(a)(1)–(2) ............................................... 12

42 U.S.C. § 2000cc-3(c) ....................................................... 25

42 U.S.C. § 2000cc-3(g) ....................................................... 12

## Legislative History

146 Cong. Rec. 14273 (daily ed. July 13, 2000) ...................... 14

146 Cong. Rec. 16698 (daily ed. July 27, 2000) ...................... 15

146 Cong. Rec. S6585 (daily ed. July 13, 2000) ...................... 14

*Protecting Religious Freedom After* Boerne v. Flores*: Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. (1997) ............................................................. 6

*Protecting Religious Freedom After* Boerne v. Flores *Part II: Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary,* 105th Cong. (1998) .................................... 13

*Protecting Religious Freedom After* Boerne v. Flores *Part III: Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. (1998) .................................... 13

## Other Authorities

Cal. Off. of Admin. L., *Notice of Approval of Regulatory Action* (Nov. 22, 2022), https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2022/11/Adopted_Regulations_NCR_21-14.pdf .................................................................. 28

DOJ, *Report on the Twentieth Anniversary of the Religious Land Use and Institutionalized Persons Act*, 26 (Sept. 22, 2020), https://www.justice.gov/crt/case-document/file/1319186/download ....................................... 7

Fed. Bureau of Prisons, *Program Statement: Inmate Personal Property* (Aug. 22, 2011), https://www.bop.gov/policy/progstat/5580_008.pdf ........................... 27

Fed. Bureau of Prisons, *Technical Reference: Inmate Religious Beliefs and Practices* (Mar. 27, 2002), https://www.acfsa.org/documents/dietsReligious/FederalG uidelinesInmateReligiousBeliefsandPractices032702.pdf ................ 27

Ga. Dep't of Corr., *Standard Operating Procedures: Religious Accommodations* (May 7, 2021), https://public.powerdms.com/GADOC/documents/106462 ............... 27

Laura M. Maruschak & Todd. D. Minton, *Correctional Populations in the United States, 2017-2018*, Bureau of Justice Stat. (Aug. 27, 2020), https://bjs.ojp.gov/library/publications/correctional-populations-united-states-2017-2018 ................................................. 27

U.S. Comm'n on Civil Rights, *Enforcing Religious Freedom in Prison* (2008), https://www.usccr.gov/files/pubs/docs/STAT2008ERFIP.pdf ........................................................................... 6, 7

## AMICI CURIAE'S IDENTITY, INTEREST, AND AUTHORITY TO FILE[1]

The Islam and Religious Freedom Action Team (IRF) of the Religious Freedom Institute represents Muslim voices on religious freedom issues, seeks a deeper understanding of the support for religious freedom inside the teachings of Islam, and protects the religious freedom of Muslims. The IRF engages in research, education, and advocacy on core issues including freedom from coercion in religion and equal citizenship for people of diverse faiths. It also translates resources by Muslims about religious freedom in order to foster inclusion of Muslims in religious freedom work and partners with the Institute's other teams in advocacy.

The Jewish Coalition for Religious Liberty is a cross-denominational association of lawyers, rabbis, and communal professionals who practice Judaism and are committed to religious liberty. As adherents of a minority religion, its members have a strong interest in ensuring that

---

[1] The parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici* and their counsel, made a monetary contribution intended to fund the preparation or submission of this brief. This brief was prepared in part by a clinic operated by Yale Law School, but does not purport to present the School's institutional views, if any.

1

religious liberties are protected and that diverse religious viewpoints and practices can flourish.

The Sikh Coalition is a nonprofit organization that promotes the civil liberties of all people, especially Sikhs, by advocating in courts and legislatures across the country, educating the broader public, and encouraging Sikh Americans to participate in civic engagement. The Sikh Coalition works towards a world where Sikhs, and other religious minorities in America, may freely practice their faith without bias and discrimination.

Though the facts underlying this appeal do not involve Islamic, Jewish, or Sikh religious expression or beliefs, the lower court's application of the wrong standard for a prisoner's religious accommodation claims is of great concern to all faith groups and to minority faiths especially. In particular, Amici worry that the lower court's reasoning and holding, if uncorrected, will have especially deleterious effects on adherents of minority religious faiths who, like Appellant, often face unique challenges to religious exercise.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Anthony Chernetsky, a sincere member of the Wiccan faith, has for years been fighting for his right to use natural prayer oils from outside vendors. The state banned this practice, despite the facts that: (1) the oils pose no more danger than other religious and secular items allowed to prisoners; and (2) numerous states safely allow the use of prayer oils from outside vendors. The ban is clearly impermissible under the strict scrutiny analysis mandated by the Religious Land Use and Institutionalized Persons Act (RLUIPA) and Supreme Court precedent. The lower court, however, failed to even apply the required standard, instead improperly deferring to the judgment of prison officials and dismissing Mr. Chernetsky's RLUIPA claim in one conclusory paragraph. That failure alone requires that, at the very least, this case be remanded for further consideration.

Prior to RLUIPA, Supreme Court precedent required courts to defer to the judgment of prison officials in their enactment of restrictions on religious practices. Congress passed RLUIPA specifically to vitiate that deference and replace it with an exacting strict scrutiny framework whereby restrictions on inmates' sincerely held religious beliefs would

*only* be upheld if the state met its burden of showing that those restrictions were the least restrictive means to achieve a compelling governmental interest.

While RLUIPA's protections are important to followers of all faiths, they are particularly crucial for adherents of minority religions, who—whether because of the majority's lack of understanding or mistrust of something different—are more likely to face skepticism of and therefore restrictions on their religious beliefs. As evidenced by Mr. Chernetsky's case, the harms to religious minorities are compounded when lower courts ignore RLUIPA's requirements and improperly accord unchecked deference to prison officials. Unfortunately, Mr. Chernetsky is not alone. Prison officials and the lower courts routinely devalue the beliefs of religious minorities, forcing them to needlessly endure years of litigation and appeals and depriving them of the full benefit of RLUIPA's promise.

For these reasons and as explained further herein, Amici respectfully urge this Court to unequivocally reiterate the demanding scrutiny required by RLUIPA, hold that the District Court erred in failing to apply that standard, and find that Nevada's restrictions cannot survive strict scrutiny.

## ARGUMENT

## I. CLEAR GUIDANCE FROM THIS COURT WILL FULFILL RLUIPA'S PROMISE TO PROTECT RELIGIOUS MINORITIES.

RLUIPA affords robust protections for all religious prisoners, but religious minorities are especially vulnerable when courts limit RLUIPA from living up to its full promise. This case affords the Court an opportunity to reiterate those protections. Eliminating undue deference to vague prison policies, requiring the government to show precisely how specific religious requests implicate compelling interests, and prohibiting lower courts from resting on undifferentiated concerns about security or costs will help shield religious minority prisoners from unlawful burdens on their religious exercise.

### A. RLUIPA is uniquely important for religious minorities.

While all religious observers benefit from RLUIPA, the law is uniquely important to religious minorities. RLUIPA was meant, in part, to revive certain aspects of the Religious Freedom Restoration Act (RFRA), which the Supreme Court held unconstitutional as applied to the states. *See Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005); *Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 985 (9th Cir 2006)

5

("Congress enacted RLUIPA in response to the constitutional flaws with RFRA identified by *City of Boerne*.").

During hearings on the RLUIPA bill, one congressman noted that "one of Congress' principal concerns" in enacting RFRA—and thus, by extension, RLUIPA—was to aid "unpopular and minority faiths" from laws that burdened religion. *Protecting Religious Freedom After* Boerne v. Flores: *Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. 10 (1997); *see also id.* at 40 ("we were anticipating that minority religions would receive less favorable treatment."). Witnesses testified that religious minorities require heightened protection against "insensitivity," "anti-religious feelings," and even "hostile views." *See id.* at 22, 27, 57.

Although the passage of RLUIPA has undoubtedly provided additional protections to all religious believers, adherents to minority faiths still bear disproportionate burdens. The United States Commission on Civil Rights has explained that—"particularly where non-Christian faiths are concerned"—prison staff "frequently regard inmates' religious commitment and practices with skepticism." U.S. Comm'n on Civil Rights, *Enforcing Religious Freedom in Prison*, 31

(2008), https://www.usccr.gov/files/pubs/docs/STAT2008ERFIP.pdf. This skepticism "negatively affects prison accommodation of their religious practices." *Id*. This can happen in two ways. When prison officials receive requests from unfamiliar religions, they are more likely to (1) deem the religious accommodation unviable or unsafe, and (2) devalue the religious practice as insubstantial or only preferred.

It is thus no surprise that the Department of Justice (DOJ) has found that "RLUIPA claims in institutional settings are most often raised by people who practice minority faiths." DOJ, *Report on the Twentieth Anniversary of the Religious Land Use and Institutionalized Persons Act*, 25–26 (Sept. 22, 2020), https://www.justice.gov/crt/case-document/file/1319186/download.[2] In fact, in the past three years alone, this Court has resolved at least eight appeals involving members of minority religious groups—comprising a majority of the Court's RLUIPA

---

[2] DOJ frequently intervenes on behalf of these prisoners to protect them from "violat[ing] a central tenet of [their] religion or suffer[ing] increasingly severe penalties." *Id*.; *E.g.*, Complaint in Intervention at 3, *Basra v. Cate,* No. 2:11-cv-01676 (C.D. Cal. 2011).

docket.[3] And lower courts in this circuit routinely encounter claims from religious minorities. *See, e.g.*, *Blake v. Dzurenda,* No. 3:19-cv-00321-ART-CSD, 2022 WL 17081166 (D. Nev. Nov. 18, 2022) (Hindu plaintiff); *Elias v. Kinross*, No. 2:17-CV-2106-WBS-DBP, 2022 WL 4130711 (E.D. Cal. Sept. 12, 2022) (Wiccan plaintiff); *Uhuru v. Bonnifield*, No. 2:19-CV-10449-JVS-KES, 2022 WL 3580769 (C.D. Cal. July 19, 2022) (Nubian Hebrew plaintiff).

## B. This case highlights the need for this Court to clearly reaffirm the exacting burden that RLUIPA imposes on the state.

Despite admonitions by both this Court and the Supreme Court, this case shows that the lower courts continue to improperly give deference to prison officials when they place burdens on inmates' free

---

[3] *See Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022) (Nation of Islam plaintiff); *Johnson v. Baker*, 23 F.4th 1209 (9th Cir. 2022) (Muslim plaintiff); *Al Saud v. Days*, 36 F.4th 949 (9th Cir. 2022) (same), *amending and superseding on rehearing*, 50 F.4th 705 (9th Cir. 2022); *Watkinson v. Alaska Dep't of Corr.*, No. 21-35084, 2022 WL 1301895 (9th Cir. 2022) (Asatru plaintiff), *cert. denied*, 143 S. Ct. 732 (2023); *Bautista v. Roskamm*, No. 21-15476, 2022 WL 2662876 (9th Cir. July 11, 2022) (Messianic Jewish plaintiff); *Riley v. Kernan*, 815 F. App'x 163 (9th Cir. 2020) (Teachings of Ausar plaintiff); *Beraha v. Dzurenda*, No. 20-16516, 2022 WL 17818544 (9th Cir. Dec. 20, 2022) (Jewish); *Alphonsis v. Garnica*, No. 21-56141, 2022 WL 7842130 (9th Cir. Oct. 14, 2022) (Muslim plaintiff).

exercise of religion. This continued deference imposes disproportionate burdens on adherents of minority faiths.

As discussed below—whether due to fear or a lack of understanding—minority adherents are more likely to face skepticism of and therefore restrictions on their religious beliefs. If lower courts are allowed to show deference to these actions, the impact on religious minorities is needlessly compounded. Mr. Chernetsky's case exemplifies the problem:

- Mr. Chernetsky faced a ban on a religious item—Wiccan anointing oil from outside vendors—despite the fact that the oil imposes no more of a threat than other more familiar religious and secular items and despite the fact that numerous prisons safely allow the use of such natural oils.

- After 17 years of litigation, Mr. Chernetsky has still been unable to vindicate his religious rights under RLUIPA, because the lower court, in effect, reversed the burden. Instead of requiring the state to meet its "exceedingly demanding" burden of providing "detailed evidence" that its religious restrictions are necessary, the lower court has effectively required Mr. Chernetsky to prove why his beliefs are worth protecting. This is a herculean task for an incarcerated *pro se* litigant, and one not envisioned by RLUIPA.

Unfortunately, Mr. Chernetsky is not alone. Minority religious practices are regularly devalued by both prison officials and the lower courts. *See, e.g.*, *Haight v. Thompson*, 763 F.3d 554, 564–67 (6th Cir. 2014) (rejecting prison officials' devaluation of a Native American's

religious practice); *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 459 (6th Cir. 2019) (same, regarding a Wiccan's religious practice). Adherents of these faiths—the vast majority of whom are *pro se* litigants[4]—thus endure years of unnecessary litigation as they continue to suffer improper restrictions on the sincere exercise of their faiths. *See, e.g.*, *Blake v. Dzurenda*, No. 3:19-cv-00321-ART-CSD, 2022 WL 1597801 (D. Nev. May 3, 2022) (claim by Hindu that took over 5 years to resolve), *report and recommendation adopted in part and rejected in part*, 2022 WL 17081166 (D. Nev. Nov. 18, 2022); *Johnson v. Lopez,* No. 2:15-cv-00884-JAD-NJK, 2018 WL 1567351, at *4 (D. Nev. Mar. 30, 2018) (claim by Muslim that took over 10 years to resolve).

Although these litigants are often vindicated in the appellate courts, by that point—as in the case of Mr. Chernetsky—the damage has already been done. Accordingly, Amici urge the Court to use this case as an opportunity to reiterate even more clearly what it held in *Johnson v. Baker*, 23 F.4th 1209 (9th Cir. 2022): RLUIPA means what it says, and restrictions on religious beliefs—no matter how foreign they may seem—

---

[4] In the Ninth Circuit and its district courts, for example, the vast majority of RLUIPA claims are filed pro se.

will not be tolerated unless the state is able to meet its most exacting burden. Until both the states and the lower courts truly hear and heed that message, believers in minority faiths will continue to be denied the full benefits of RLUIPA.

## II. THE DISTRICT COURT ERRED BY FAILING TO APPLY THE STRICT SCRUTINY FRAMEWORK MANDATED BY RLUIPA.

The district court's application of the wrong standard in this case exemplifies why clear guidance from this Court is critical. RLUIPA requires courts to go beyond the test established in *Turner v. Safley* and apply strict scrutiny to prisoners' religious accommodation claims. Congress enacted RLUIPA after finding that *Turner*'s free exercise protections inadequately protected the rights of religious prisoners. Under RLUIPA, both the Supreme Court and this Court require a more-intensive and less-deferential strict scrutiny analysis. *Holt v. Hobbs*, 574 U.S. 352, 358 (2015); *Johnson*, 23 F.4th at 1217. Because the court below failed to apply that standard in this case, reversal is warranted.

### A. RLUIPA Was Passed Specifically to Replace the Deferential *Turner* Standard with Strict Scrutiny.

RLUIPA governs restrictions on an institutionalized person's religious exercise by state or local governments. The plain text of the statute

instructs courts to apply strict scrutiny, stating: "No Government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden "(1) is in furtherance of a compelling government interest; *and* (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a)(1)–(2) (emphasis added). Congress further included "rules of construction" in RLUIPA to ensure that courts understood that RLUIPA provided more protection than courts had afforded in the free exercise context. Thus, RLUIPA instructs courts to construe the law "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

RLUIPA's legislative history confirms that the statute was specifically intended to afford prisoners greater protection of their religious liberties than had been previously afforded under the *Turner* standard. In *Turner v. Safley*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). Under this standard, courts cannot "substitute [their] judgment

on . . . difficult and sensitive matters of institutional administration," but instead must defer to the experience and expertise of prison officials. *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 353 (1987) (quoting *Block v. Rutherford*, 468 U.S. 571, 588 (1984)).

Leading up to RLUIPA's enactment, Congress heard repeated testimony about the harms that religious prisoners suffered under *Turner*. For example, a reverend in the Oklahoma state prison system stated that Bibles, Korans, Catholic sacramental wine, and other harmless religious items were, at times, not permitted on prison property. *See Protecting Religious Freedom After* Boerne v. Flores *Part II: Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary,* 105th Cong. 58-59 (1998) (Statement of Rev. Donald W. Brooks). Another expert testified that the needs of Jewish prisoners were often dismissed as a burden on the system. *Protecting Religious Freedom After* Boerne v. Flores *Part III: Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary,* 105th Cong. 38-39 (1998) (Statement of Isaac M. Jaroslawicz). These are just two examples drawn from extensive testimony spanning nine separate hearings. This testimony repeatedly reinforced that there

13

was insufficient judicial oversight over prisons' handling of religious accommodation requests. *See Cutter*, 544 U.S. at 716 n.5 (listing additional examples from pre-RLUIPA hearings).

Acting on this testimony and a general desire to increase protections for religious prisoners, Congress unanimously passed RLUIPA. In introducing RLUIPA, Senator Orrin Hatch, the primary sponsor of the legislation, explicitly pointed to the "[c]ongressional witnesses [who] have testified that institutionalized persons have been prevented from practicing their faith." 146 Cong. Rec. 14273, 14284 (daily ed. July 13, 2000) (statement of Sen. Hatch). Senator Ted Kennedy, another key architect of RLUIPA, also highlighted that it was "clear that institutionalized persons are often unreasonably denied the opportunity to practice their religion, even when their observance would not undermine discipline, order, or safety in the facilities," and that the strict-scrutiny framework was the best way to address that issue and provide more thorough oversight over prison officials. 146 Cong. Rec. S6585, S6688 (daily ed. July 13, 2000) (statement of Sen. Kennedy).

14

In a joint floor statement preceding the Senate's vote on RLUIPA, Senators Hatch and Kennedy re-emphasized that "some institutions restrict religious liberty in egregious and unnecessary ways," and that there were "numerous examples of thoughtless and insensitive actions by governments that interfere with religious freedom, even though no valid public purpose is served by the governmental action." 146 Cong. Rec. 16698, 16699 (daily ed. July 27, 2000) (Joint Statement of Sens. Hatch and Kennedy). The Senators emphasized that RLUIPA ensured that "'inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations w[ould] not suffice." *Id*. (quoting SR 103-111 at 10 (1993)).

## B. The Courts Have Been Clear that RLUIPA's Strict Scrutiny Framework Replaces *Turner* and Mandates an Exacting Analysis.

In light of this history, the Supreme Court has recognized that Congress passed RLUIPA, in part, "to accord religious exercise heightened protection from government-imposed burdens." *Cutter*, 544 U.S. at 714. Thus, it is well-settled that RLUIPA "mandates a stricter standard of review for prison regulations that burden the free exercise of religion than the reasonableness standard under *Turner*." *Shakur v. Schriro*, 514

15

F.3d 878, 888 (9th Cir. 2008); *see also Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (noting that RLUIPA imposes a "heavier burden" on prisons than *Turner*); *Odneal v. Pierce*, 324 F. App'x 297, 300 (5th Cir. 2009) (per curiam) (same). At bottom, when RLUIPA applies, strict scrutiny governs the analysis, and the deferential *Turner* standard does not. *See Shakur*, 514 F.3d at 888; *Odneal*, 324 F. App'x at 300.

The differences between the RLUIPA and *Turner* standards are often outcome-determinative, including in cases like this one. Under RLUIPA, the inmate bears the initial burden to show that "exercise of religion is grounded in a sincerely held religious belief" and that the government's action "substantially burden[s] that exercise of religion." *Holt*, 574 U.S. at 361. Once he has satisfied this obligation, "the burden shift[s] to the [government] to show" that substantially burdening the religious exercise of the particular claimant "(1) was in furtherance of a compelling governmental interest; and (2) was the least restrictive means of furthering that compelling governmental interest." *Id*. at 362 (alterations omitted).

In bearing this burden under RLUIPA, the state does not enjoy the deference afforded by *Turner*. The Supreme Court has reiterated that,

16

while prison officials may be experts in their field, this "does not justify the abdication of the responsibility . . . to apply RLUIPA's rigorous standard." *Id.* at 364. To the contrary, the Supreme Court has held that RLUIPA mandates that courts conduct a searching inquiry of the government's asserted interests:

> RLUIPA, like RFRA, contemplates a more focused inquiry and requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened. RLUIPA requires us to scrutinize the asserted harm […] to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context.

*Id.* at 362–63 (internal citations, alterations, and quotations omitted).

Similarly, "[t]he least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Id.* at 364–65 (internal quotations and alterations omitted). Among other things, prison officials must show that they "actually considered and rejected the efficacy of less restrictive measures" before implementing the challenged restrictions. *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005).

17

### C.     The District Court Failed to Conduct the Analysis Required by RLUIPA.

Despite the clear intent of Congress and the unequivocal mandates of the Supreme Court, the court below failed to apply the strict scrutiny framework required by RLUIPA. The court spent over four pages analyzing the case under the deferential *Turner* standard to find that the state did not violate the Free Exercise Clause. 1-ER-6–10. The court then dismissed Mr. Chernetsky's RLUIPA claim out of hand in a short paragraph that did not even attempt to engage in the required strict scrutiny analysis. 1-ER-10. Instead, the court merely referred back to its *Turner* discussion, implicitly suggesting that the RLUIPA standard is no more rigorous than *Turner*. As discussed above, that is wrong.

The District Court did not make any effort to scrutinize the state's claimed interests—much less conduct the required "focused inquiry." *Holt*, 574 U.S. at 363 (cleaned up). Rather, the court simply accepted, without question, the government's unproven assertion that allowing prayer oils would pose "a unique security threat" to the prison. Similarly, the Court did not attempt to analyze whether there were less restrictive means to achieve the state's asserted interest, much less determine whether the state had any evidence that is had "actually considered and

rejected the efficacy of less restrictive measures." *Warsoldier*, 418 F.3d at 999.

The District Court's assertion that "[s]everal courts have held that similar restrictions" do not violate RLUIPA is largely irrelevant. 1-ER-10. *First*, the issues in those cases were often fundamentally different. For example, *Riggins v. Clarke* involved a situation where "[t]he record d[id] not demonstrate that possessing prayer oils was a religious practice mandated by Appellant's faith." 403 F. App'x 292, 295 (9th Cir. 2010). By contrast here, the parties agree that Mr. Chernetsky was denied anointing oils that are "necessary for the practice of his religion."

*Second*, and more fundamentally, *other courts' analyses* of *different regulations* applied *to different prisoners* did not absolve the District Court of its obligation to conduct a strict scrutiny analysis of the burdens that Nevada's regulations have placed on Mr. Chernetsky's religious practices. In every case, RLUIPA mandates an "exceptionally demanding" analysis that requires "detailed evidence" and that is tailored to the "particular claimant." *Johnson*, 23 F.4th at 1219. The Dis-

trict Court's failure to conduct that analysis here requires that its judgment be reversed, or, at the very least, the case be remanded for further consideration.

## III. UNDER THE CORRECT LEGAL STANDARD, NEVADA FAILS TO SHOW THAT ITS PROHIBITION ON ANOINTING OILS FROM OUTSIDE VENDORS SATISFIES STRICT SCRUTINY.

If the District Court had applied the analysis required by RLUIPA it would have found that government did not meet its burden of showing that its prayer oil ban is the least restrictive means of furthering a compelling governmental interest. The state has advanced nothing more than unsupported and generalized security concerns that have been held to be insufficient to constitute a compelling governmental interest. Furthermore, even if those advanced interests were sufficient, the state has not provided any evidence that a total ban on outside prayer oils is the least restrictive means of achieving those interests. To the contrary, some of the largest prison systems in the country allow prayer oils from outside vendors, providing powerful evidence that Nevada's ban is not necessary to address its purported security concerns.

### A. Nevada's asserted compelling interests are inadequate under RLUIPA.

To demonstrate a compelling governmental interest and meet RLUIPA's "exceptionally demanding" standard, Nevada must point to a particularized interest in burdening an individual in a specific way. *Holt*, 574 U.S. at 364. Pointing to generalized "security" or "safety" interests is no substitute for this highly factual inquiry, because courts should not grant "unquestioning deference" to the government's claim. *Johnson*, 23 F.4th at 1217. Yet, that is exactly what the state has done in this case.

Nevada has provided no evidence of a compelling interest in banning prayer oils from outside vendors aside from a two-page declaration from a prison warden containing unsupported speculation regarding *potential* harms that *could* be posed by prayer oils from outside vendors. This falls far short of the "detailed evidence" required by RLUIPA. *See, e.g.*, *Holt*, 574 U.S. at 363–67; *Johnson*, 23 F.4th at 1217. RLUIPA requires a showing of facts; conclusory assertions are insufficient. *See Shakur*, 514 F.3d at 887 (concluding that mere "conclusory assertion[s]" and the lack of "detailed findings" could not support a state's compelling interest analysis in the RLUIPA context).

21

The concerns cited by the warden are speculative on their face. 2-ER-69–71. For example, the warden speculates that:

- scented oils are flammable "under the right conditions," but does not address the flammability of the specific oils that Mr. Chernetsky would use or the conditions under which those oils would be flammable, *id.*;

- "oils provide *possible* harm to other inmates from allergic reaction," but does not identify any allergens that exist in the oils that Mr. Chernetsky would use, *id.* (emphasis added);

- "inmates *may* use scented oils to create slippery surfaces," but does not explain how the oils differs in this regard from any other liquid already in the prison, including baby oils that are permitted by Nevada's regulations, *id.* (emphasis added);

- "scented oil/perfumes *may* be used for illegal bartering," but does not explain how this differs from any other items in prisoners' possession, *id.* (emphasis added); and

- mail room and intake staff may be burdened, because prisons will "*likely* receive numerous unauthorized packages," but provides no information or evidence regarding the anticipated frequency of unauthorized packaged. *Id.* (emphasis added).

These are precisely the types of unverifiable and generalized concerns that have been held to not constitute compelling governmental interests. *See Johnson*, 23 F.4th at 1217 ("[T]he government may not satisfy the compelling interest test by pointing to a general interest . . . ."); *Sherman v. Wickham*, No. 3:21-CV-00168-ART-CSD, 2022 WL 6260301, at *9 (D. Nev. Aug. 3, 2022) (inmate stated a RLUIPA claim because security

concerns were not particularized); *see also Washington v. Klem*, 497 F.3d 272, 283 (3d Cir. 2007) ("Even in light of the substantial deference given to prison authorities, the mere assertion of security or health reasons is not, by itself, enough for the Government to satisfy the compelling governmental interest requirement.").

**B. Nevada fails to show that denying access to oils from outside vendors is the least restrictive means to achieve any compelling interests.**

Even if the speculative interests identified by Nevada were compelling, the state has failed to show that a complete ban on prayer oils from outside vendors is the least restrictive means of achieving those interests. To satisfy the least-restrictive-means prong of strict scrutiny, "prison officials *must* set forth detailed evidence, tailored to the situation before the court, that identifies the failings in the alternatives advanced by the prisoner." *Johnson*, 23 F.4th at 1217 (quoting *Warsoldier*, 418 F.3d at 1000). It has not done so.

Conclusory statements aside, Nevada has not made any showing that a total ban on outside prayer oils is necessary to achieve its stated objectives. *Warsoldier*, 418 F.3d at 998–99 (striking down California's

hair-length restriction when the state presented only conclusory statements that the policy was the least restrictive means of ensuring security). For example, Nevada cannot explain why it treats prayer oils less favorably than secular products. Nevada claims that an outright ban on prayer oils is necessary to, among other things, prevent slippery surfaces and the masking of the scent of drugs. Nonetheless, the state allows prisoners to have equally slippery baby oils and equally odorous air fresheners. *See* 2-ER-17, 41. The fact that Nevada has not banned secular products that would endanger the same interests claimed by the state is strong evidence that the prayer oil ban is not the least restrictive means of achieving those interests. *Holt*, 574 U.S. at 368 (when "objectives are not pursued with respect to analogous nonreligious conduct," it "suggests that 'those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree'").

As Mr. Chernetsky noted in his opening brief, Op. Br. at 23–24, this Court already addressed a nearly identical issue in *Johnson*. There, the Court held that Nevada did not use the least restrictive means of furthering its alleged security interest when the state pointed to vague security concerns rather than "detailed evidence" tailored to the "particular

claimant," such as the amount of prayer oil that would pose a danger or why prisoners could keep other products that implicate the same security interests. 23 F.4th at 1217–19; *cf. Din v. Dep't of Corr.*, No. S-18095, 2023 WL 2151070, at *4 (Alaska Feb. 22, 2023) (rejecting Alaska's position that possessing prayer oils is dangerous as inconsistent with its policies allowing prisoners to possess other fragranced items). We agree with Mr. Chernetsky that the same conclusion must be reached here.

In fact, Nevada has done almost nothing to differentiate its ban on outside prayer oils here from the restrictions on prayer oils struck down in *Johnson*. The only possible distinction here is that Nevada appears to allege that the allowance of oils from outside sources—as opposed to from the canteen—would impose administrative and financial burdens, including the burdens of determining whether oils were tainted and returning tainted or unapproved oils. 2-ER-70. These conclusory justifications are insufficient for several reasons.

Under RLUIPA, states may be required to bear increased financial and operational costs in order to avoid imposing a substantial burden on religious exercise. 42 U.S.C. § 2000cc-3(c). Accordingly, mere administra-

tive costs are rarely an adequate reason to refuse accommodating an inmate's religious beliefs. *See, e.g.*, *Holt*, 574 U.S. at 368. Furthermore, when a state seeks to rely on such costs, it must do so with specificity and cannot rely on speculation. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 732 (2014) (rejecting the argument that granting one exemption would "lead to a flood" of religious objections as petitioners "made no effort to substantiate this prediction"); *Shakur*, 514 F.3d at 889–90 (finding that the state failed to provide "competent evidence as to the additional cost" of providing Halal or kosher meat, or to show that other Muslims would require the same accommodation). Here, Nevada has failed to do so. It has provided no evidence or specifics regarding the expected frequency of receiving tainted or unapproved oils or the cost of detecting or returning such products. Furthermore, Nevada has failed to explain why similar burdens are not implicated by the other religious and secular items that the state allows to be imported from outside vendors, including stones, herbs, minerals, and incense. 2-ER-49–67.

Finally, any assertion that a total ban of outside prayer oils is necessary to prison operations or security is severely undermined by the fact

that seven states[5]—including two of the top four states with the most prisoners—and the federal Bureau of Prisons,[6] which together account for over 500,000 inmates[7], permit prisoners to receive religious oils from outside vendors. For instance, California permits a variety of prayer oils from an approved vendor, if shrink-wrapped and clear or transparent.[8]

---

[5] *See* Cal. Code Regs. tit. 15, § 3190 (Religious Personal Property Matrix); Ga. Dep't of Corr. Policy No. 106.11 (May 7, 2021), https://public.powerdms.com/GADOC/documents/106462; Haw. Dep't of Pub. Safety No. COR.12.05 (May 3, 2017), https://dps.hawaii.gov/wp-content/uploads/2017/05/COR.12.05.pdf; Kan. Dep't of Corr. IMPP 10-110D (Jan. 30, 2018), https://www.doc.ks.gov/kdoc-policies/AdultIMPP/chapter-10/10-110d/view; N.M. Dep't of Corr. Policy CD-101300 (Apr. 6, 2022), https://www.cd.nm.gov/wp-content/uploads/2022/04/CD-101300.pdf; N.Y. State Dep't of Corr. & Cmty. Supervision DIR# 4202 (Oct. 19, 2015), https://doccs.ny.gov/system/files/documents/2020/11/4202.pdf; Wash. Dep't of Corr. DOC 560.200 (Feb. 17, 2014), https://www.doc.wa.gov/information/policies/files/560200.pdf (Attachment 1).

[6] The Bureau of Prisons allows inmates to purchase personal religious property such as oils either from commissary or an approved catalog source. Fed. Bureau of Prisons, *Program Statement: Inmate Personal Property* (Aug. 22, 2011), https://www.bop.gov/policy/progstat/5580_008.pdf; Fed. Bureau of Prisons, *Technical Reference: Inmate Religious Beliefs and Practices* (Mar. 27, 2002), https://www.acfsa.org/documents/dietsReligious/FederalGuidelinesInmateReligiousBeliefsandPractices032702.pdf.

[7] Laura M. Maruschak & Todd. D. Minton, *Correctional Populations in the United States, 2017-2018*, Bureau of Justice Stat. (Aug. 27, 2020), https://bjs.ojp.gov/library/publications/correctional-populations-united-states-2017-2018.

[8] Cal. Off. of Admin. L., *Notice of Approval of Regulatory Action* (Nov. 22, 2022), https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2022/11/Adopted_Regulations_NCR_21-14.pdf.

California's commentary on its regulations acknowledges potential security risks, but, to respect religious practice, it permits certain oils that have been reviewed for safety and security. Georgia, which has one of the highest incarceration rates in the United States, also permits offenders to purchase anointing oils through the facility commissary or directly from an approved vendor, citing RLUIPA and *Holt v. Hobbs*, among other authorities.[9]

Although evidence that other states permit the conduct at issue is not dispositive, "a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt*, 574 U.S. at 369 (noting that Arkansas' prohibition on beards departed from the majority of state policies); *Warsoldier*, 418 F.3d at 1000 (finding that California failed to show why it had a superior interest in regulating conduct than other states). Here, Nevada has not and cannot show why other states with large prison populations are able to safely allow outside prayer oils, but Nevada is not. Nevada's inability to provide such an explanation means that it has failed to carry its burden under RLUIPA. *See Mast v. Fillmore Cty.*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J., concurring in the

---

[9] Ga. Dep't of Corr. Policy No. 106.11.

28

decision to grant certiorari, vacate, and remand) ("It is the government's burden to show this alternative won't work; not the [RLUIPA petitioner's] to show it will.").

***** 

The District Court failed to even apply the strict scrutiny framework mandated by RLUIPA. However, if it had, the court would have been required to conclude that the state has failed to meet its demanding burden.

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court's judgment should be vacated, and summary judgment should be entered for Mr. Chernetsky. At the very least, the case should be remanded for further consideration.

March 28, 2023                    Respectfully submitted,


                                 /s/ *Dino L. LaVerghetta*

Nicholas R. Reaves               Dino L. LaVerghetta
YALE FREE EXERCISE CLINIC        Christopher S. Ross
1919 Pennsylvania Ave. NW,       SIDLEY AUSTIN LLP
Suite 400                        1501 K Street NW
Washington, DC 20006             Washington, DC 20005
(202) 955-0095                   Tel: (202) 736-8000
nicholas.reaves@yale.edu         Fax: (202) 736-8711
                                 dlaverghetta@sidley.com
                                 christopher.ross@sidley.com

                                 Connor R. Brewer
                                 SIDLEY AUSTIN LLP
                                 2021 McKinney Ave., Ste. 2000
                                 Dallas, TX 75201
                                 cbrewer@sidley.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 32-1(a) because it contains 5,624 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Century Schoolbook font.

/s/ *Dino L. LaVerghetta*
Dino L. LaVerghetta
*Counsel to Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on March 28, 2023 by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Dino L. LaVerghetta*
Dino L. LaVerghetta
*Counsel to Amici Curiae*